[Civ. No. 4950. Fourth Dist. Mar. 16, 1956.]

THE CITY OF LOS ANGELES et al., Appellants, v.
THOMAS M. FREW, JR., et al., Respondents.

Roger Arnebergh, City Attorney (Los Angeles), Gilmore Tillman, Chief Assistant City Attorney, and Russell B. Jarvis, Assistant City Attorney, for Appellants.

A. V. Falcone for Respondents.

MUSSELL, J.—This is a proceeding in condemnation in which the appellants, City of Los Angeles and Department of Water and Power of said city, obtained an interlocutory judgment condemning a right of way easement for electrical transmission lines through a section of farm land in Kern

County, owned by the defendants. The land sought to be condemned is described in the complaint as Parcel 88 and is 250 feet wide and 6,032.29 feet long. It extends diagonally through Section 32, Township 10 north, Range 13 west, S.B.B. & M., crossing the northerly line of Section 32 about 900 feet westerly of the northeast corner thereof and angles southwesterly until it crosses the south line of the section about 1,300 feet easterly of the southwest corner. The appellants took immediate possession by ex parte order and constructed its first line of six towers and a permanent hardpack road along the entire right of way. The towers vary in height from 76 to 91 feet and the sides of their bases vary from 27 feet $2\frac{1}{2}$ inches to 31 feet $10\frac{3}{8}$ inches. The towers rest on cement legs or foundations 20 inches in diameter, placed in the ground from 9 to $9\frac{1}{2}$ feet deep. The easement provides for a second line of towers, to be "staggered" in relation to the first line. The first line of towers and the present 15-foot road occupy 115 to 120 feet of the easterly one-half of the 250-foot right of way. The right of way divides Section 32 so that the original 640 acres are severed as follows: 34.62 acres in the right of way, 285.03 acres to the east, and 320.35 acres to the west of the right of way. The easement expressly includes all secondary easements "in, under, over and across" the right of way and these include underground wires or "dissipators" which will be installed 3 feet below the ground and fan out on the right of way.

A jury ascertained and assessed the value of the easement and rights of way sought to be condemned to be the sum of $4,673.70 and the severance damages to be $22,171.96, a total of $26,845.66. Plaintiffs appeal from the judgment entered in accordance with the verdict and contend that the damages are excessive; that the trial court committed prejudicial error in overruling appellants' objections and denying their motions to strike; that the verdict was defective; that improper evidence was received; that the court erred in denying appellants the right to abandon a portion of the easement sought to be acquired; that the court erred in limiting the testimony of appellants' witnesses, and in refusing to give certain offered instructions.

It was conceded that the highest and best use of the land in Section 32 was for potential agricultural use and 12 witnesses testified in the nine-day trial relative to the issue of damages. Witnesses for the defendants testified that the

value of the entire section before taking was from $96,000 to $128,000 and after taking from $57,375 to $61,251.40. They valued the right of way from $4,680 to $6,231, the severance damages from $33,945 to $60,538, and the total damages from $38,625 to $66,769.70. Two experts testified for plaintiffs that the right of way value was from $1,675 to $1,800, and that there were no severance damages.

George Hummel, called as a witness in behalf of defendants, testified that he was and had been a real estate broker for 15 years; that he was familiar with the Frew and Lombardi ranches in Sections 32 and 31; that the defendants owned all of Section 32 and the east one-half of Section 31 adjoining it; that Frew and the Lombardis bought the property in 1949; that he was familiar with Section 32; that the soil was good and that substantial water production was established on said section in 1949; that he had sold some 3,000 acres to different persons in the area and, based on his experience as a real estate broker and in participating in sales of property in the area, his opinion was that the market value of the land on February 3, 1950 (the date agreed upon by the parties as the date of valuation) was $200 per acre; that the market value of the remainder of Section 32 was reduced by 50 per cent by the taking of the right of way and easement; that his $200 valuation was based upon evidence that water had been found in commercial quantities and the land was in position to be developed for agricultural purposes; that it was especially good for the growing of row crops, such as potatoes, onions, cotton and alfalfa seed; that the remaining land in the section would be worth only 50 per cent with the right of way through it by reason of the added difficulty and additional labor in irrigating and cultivating crops thereon.

Paul Adler testified that he was a farmer and owned 320 acres adjoining Section 32; that he was familiar with Section 32 and had made inquiries as to the relative values of sales of neighboring properties in 1949 and 1950; that the right of way, 250 feet by 6,032.29 feet, extending diagonally across Section 32, with the towers, a permanent road for vehicular travel, and the installation of underground wires for lighting purposes which go from each tower, north, south, east and west and practically to the outskirts of the 250-foot right of way, would constitute a barrier to normal farming of Section 32, making it difficult to cultivate because of the varying length of furrows; that it would be extremely expensive to install an irrigation system on the east portion of the prop-

erty; that it would be more difficult to operate farm machinery on the property; that the fair market value of Section 32 on February 3, 1950, with the well on it, was about $200 per acre and that the market value of the remaining land after the taking would be reduced by 50 per cent.

Frank Rattman, an experienced well driller, testified that he drilled a water well on the northwest quarter of Section 32 in 1949 and that the section was one of the best water areas he had found in that locality.

Earl W. McGowan, a concrete irrigation pipe manufacturer and installer, testified that he was familiar with Section 32 and installed an irrigation system for row crops on Section 31, which the Lombardis and Frew were farming; that he was employed by the defendants, Lombardis and Frew, to inspect Section 32 and compute the cost of installation of an irrigation system thereon with and without the power line and right of way. The trial court sustained an objection to testimony as to the specific cost but permitted McGowan to testify that it would definitely cost more to install the system with the power line, the road and the right of way across the property.

Virgil Alleso, a land leveler and farmer in Antelope Valley, testified that he was employed by the defendants to make an estimate on Section 32 on leveling and grading and that it would cost more to do the leveling and grading on the property after the power line was put in and the right of way was taken.

Albert Icardo, owner and farmer of 900 acres, farmed with row crops, in the Palmdale area, testified that he was familiar with Section 32 in February, 1950, and purchased some land in that area; that he inspected the general area and learned the value of different ranches and the prices asked by prospective sellers; that the fair market value of Section 32 on February 3, 1950, with the well on it, was around $200 an acre; that after the right of way went in, the value of the remaining land was reduced to $100 per acre because of the trouble in irrigating, cultivating and plowing.

Walter Parks, a farmer for 15 years, who owned and farmed 520 acres in the Willow Springs area close to Section 32, testified that before he purchased his property, about three years prior to the time of the trial, he inspected the area and obtained information as to the value of land. After the easement and right of way was described to Parks, he stated that

the value of the land on February 3, 1950, with the well, was $200 per acre and with the easement he "would hate to have to buy that land for $100.00 an acre"; that they had a right of way through their property running on an angle and that "there is a lot of labor involved that shouldn't be."

Thomas M. Frew, Jr., testified that he had experience in installing commercial irrigation systems and started farming in 1949; that he acquired Sections 32 and 31 with the Lombardi brothers; that since acquiring the property they have farmed Section 31 and made some improvements on Section 32; that he was familiar with the surrounding farms and ranches and that the fair market value of Section 32 on February 3, 1950, was $200 per acre, with the well on it; that the 34.62 acres in the right of way for a permanent easement was worth 90 per cent of $200 per acre; that the damage to the remaining property was $100 per acre. He based this statement on the inability to farm the land and control the water, the extra time needed to farm and the necessity for extra pipe lines by reason of the easement.

Julio Lombardi, part owner of Section 32 and a farmer for many years, testified that when they brought the well in on Section 32 the land was worth $200 per acre; that the fair market value of the easement was 90 per cent of $200, multiplied by 34.62 (the number of acres taken); that the remaining portion of Section 32 would be damaged 50 per cent by the easement; that with the easement, the leveling cost would be greater; that the remaining land could not be farmed with "good efficiency, only at an angle"; that the pipe lines would have to be higher; that the irrigation problem would be increased and the expense thereof would be twice as much; that a lot of land would be lost by reason of the limitation on turning the farm equipment to keep it off the right of way.

Joseph Gallagher, Sr., a real estate broker, appraiser and right of way specialist for many years, testified on behalf of defendants that he was employed by them for the purpose of making an appraisal of the market value of Section 32, the value of the easement, and the severance damages; that he inspected geological maps of the area and personally inspected the property on several occasions; that he secured information from many farmers and others in the area; that he considered that the highest, best and most profitable use the land was adapted to was progressive farming, such as was conducted on Section 31; that the land was adaptable for the raising of various types of row crops; that the market value of the

easement was 90 per cent of the fee value. He fixed the value of the easement at $4,680 and testified that in his opinion the severance damages were $33,945. He further testified that the soil on the Lombardi-Frew property was good and was easily cultivated; that the supply of water was excellent and that there were good returns from crops planted in the area; that there was a strong buyers' interest in the district as indicated by the number of purchases; that he talked to many people in the vicinity relative to the capability and market value of the land, the cost of preparing and installing a complete irrigation system and clearing and leveling the land; that the information he obtained and the investigation he made furnished the basis for his opinion as to valuation; that he estimated the value of the land in Section 32 at $150 per acre before the taking; that the utility of the land remaining has been interfered with by the easement; that the leveling and irrigation costs will be increased; that the cost for dusting the crops will be increased; that approximately 55 acres have been lost for farming operations by reason of the distance required to turn heavy equipment when the farmers work in the field; that the rows will be pointed and shortened and there will be trouble in controlling the water flow which will require additional labor and manpower on the land itself to take care of the water flow along and through the short rows in comparision with longer rows; that there will be heavy and serious objection on the part of prospective purchasers of the land by reason of the existence of the transmission line across it in a diagonal direction.

Cloice D. Carll, whose business has been real estate appraisals for 25 years and who was called as a witness in behalf of plaintiffs, testified that he had appraised many properties, including rights of way for steel transmission lines; that he had been on Section 32 about 17 times and that the soil is all good agricultural soil; that a sales map was prepared, market data was gathered, and there were many interviews in confirmation of sales of property in the area; that in his opinion the fair market value of the right of way and easement on Section 32 as of February 3, 1950, was $1,675, and that there were no damages to the remaining land by reason of the taking of the right of way and the easement.

Thomas P. Mason, realtor and appraiser, testified in behalf of plaintiffs that he had appraised many rights of way, in-

cluding those for construction of transmission lines; that from his investigations and studies of Section 32 it was his opinion that the highest and best use of the section was potential agricultural use; that the easement rights sought in this case as of the date of valuation were $1,800; that in his opinion the remaining land would sell for just as much after the right of way as it did before, and that there was no severance damage.

Appellants first contend that it was prejudicial error for the court to permit Mr. McGowan and Mr. Adler to testify that the cost of installing the irrigation system on the land would be increased after the taking; permitting Mr. Adler to testify that the cost of leveling the land would be increased after the taking; and permitting Mr. Frew to testify as to the cost of the well on the property. We find no prejudicial error in the rulings of the trial court in admitting the questioned testimony.

In *San Bernardino & Eastern Ry. Co.* v. *Haven*, 94 Cal. 489, 493 [29 P. 875], it was held that the increased cost of irrigating uncultivated land which is shown to be adapted for cultivation, and to require irrigation, which would be caused by the building of a railroad through the land involved, is a legitimate subject of inquiry for the purpose of ascertaining the damage sustained by the owner. The same rule is applicable to admission of evidence as to increase in the cost of leveling such land.

In *Colusa & Hamilton R. R. Co.* v. *Leonard*, 176 Cal. 109, 119 [167 P. 878], the court said:

"In the case of *Colusa etc. R. Co.* v. *Glenn*, reported in 25 Cal.App. 634 [144 P. 993], the rule for computing damages was stated as given in *Blunck* v. *Chicago & N. W. Ry. Co.*, 142 Iowa 146 [120 N.W. 737], as follows: 'The real question in such cases being how much has the market value of the property been diminished by taking the right of way therefrom, it is manifest that in determining and fixing such damages all matters and conditions which may reasonably be expected to follow the location and operation of the road and affect the value of the land should be considered.' "

The record shows that the trial court permitted testimony as to the fact of such increased costs but not the specific amounts thereof and that such evidence was permitted not to prove the fact or amount of said costs separately but only as elements of severance damage. The record shows that Frew testified that the total cost of the well on the property,

the pump and the drilling was $22,000 and the only objection made by appellants to this testimony was the general objection to any testimony as to any improvement on the property after February 3, 1950. Frew testified that the well was drilled in the summer of 1949 and there was no prejudicial error in admitting the testimony under the circumstances shown.

Appellants next contend that it was prejudicial error for the court to allow witnesses Hummel, Adler, Icardo, Parks, Frew, Lombardi and Gallagher to testify on value and damages as they were unqualified to give opinion evidence, or they did not understand the terms of the rights sought to be taken and the rights remaining in the owners. We are not in accord with these contentions.

In *People* v. *La Macchia,* 41 Cal.2d 738, 746 [264 P.2d 15], the court said:

" 'All that is necessary to be shown to entitle a witness to give an opinion is to show "that he has some peculiar means of forming an intelligent and correct judgment as to the value of the property in question . . . beyond what is presumed to be possessed by men generallly." ' (*Spring Valley W. W.* v. *Drinkhouse,* 92 Cal. 528, 534 [28 P. 681].) The usual expert is qualified by proof of his familiarity with the property and with other property in the neighborhood, his experience in the business, his familiarity with the state of the market and of sales of similar property in the vicinity. (*Estate of Ross, supra* [171 Cal. 64 (151 P. 1138)], at pp. 66-67.) A property owner, on the other hand, is generally considered competent to estimate the value of his property upon a showing that he has resided thereon for a number of years. (*Long Beach City H. S. Dist.* v. *Stewart, supra* [30 Cal.2d 763, (185 P.2d 585, 173 A.L.R. 249)], at p. 772; *Spring Valley W. W.* v. *Drinkhouse, supra,* at p. 534.) "

In *Los Angeles City High School Dist.* v. *Rodriguez,* 135 Cal.App.2d 760 [287 P.2d 871] (hearing denied by the Supreme Court), it is said that the right of an owner to testify as to the value of his property is so well established as to call for but a token citation of authority; that the court has rather broad discretion in ruling upon the sufficiency of a qualification of a witness to express an opinion as to value; that one does not have to be a so-called expert to be competent to express an opinion as to the value of real property, nor is it necessary that he be engaged in business as a

broker or professional appraiser; that it is sufficient that the witness have some peculiar means of forming an intelligent judgment beyond that which is presumed to be possessed by men generally; that owners of land in the vicinity familiar with the property in question are competent witnesses and that owners of land in the vicinity familiar with the character of the land in question frequently have a better idea of land values than strangers who are engaged in the business of selling land. The rule is there stated, quoting from *City of Stockton* v. *Ellingwood*, 96 Cal.App. 708, 716 [275 P. 228]:

" 'If a witness, by reason of his skill, learning, or technical training, understands the adaptability of the lands in question for a particular purpose, and the demand for land for such purpose, he may state the market value of the land, although he may be entirely unacquainted with the other elements which would be considered by different buyers competing for the same property. On the other hand, if the witness has knowledge of the market value of the lands, even though he possesses no technical skill, training, or ability, he may state the market value. The different elements considered by the witnesses in giving their opinions as to market value may be inquired into upon cross-examination, and if, upon such cross-examination, it appears to the court that the witness' testimony is based upon improper consideration, or upon what is usually termed as speculative only, it should be stricken from the record or withdrawn from the consideration of the court or the jury.' "

In *Long Beach City H. S. Dist.* v. *Stewart*, 30 Cal.2d 763, 772 [185 P.2d 585, 173 A.L.R. 249], it was held that "Appellant, by virtue of ownership and residence on his property for a number of years, qualified as a person entitled to express an opinion as to its value."

In *Bagdasarian* v. *Gragnon*, 31 Cal.2d 744, 754 [192 P.2d 935], the court held that there was no merit in appellant's contention that the farmers, farm appraisers and real estate brokers who gave expert testimony for respondents on the subject of value were not properly qualified where all of them were shown to be familiar with the value of farming land in the community, and, although some of them did not see the farm in 1944, there was evidence that it was then in substantially the same condition as at the time the appraisals were made.

The trial court is the judge of the qualifications of the witness to testify as to land values. (*Redwood City Ele-*

*mentary Sch. Dist.* v. *Gregoire,* 128 Cal.App.2d 766, 770 [276 P.2d 78].) The court held in that case (p. 769) that:

"It is well settled in this state that fair market value is to be arrived at by considering all the purposes for which the property is adaptable. In the recent case of *People* v. *La Macchia,* 41 Cal.2d 738, 751 [264 P.2d 15], it was said: 'This court "has definitely aligned itself with the great majority of the courts in holding that damages must be measured by the market value of the land at the time it is taken, that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted."' (And see *Sacramento etc. R. R. Co.* v. *Heilbron,* 156 Cal. 408, 412 [104 P. 979]; *City of Los Angeles* v. *Cole,* 28 Cal.2d 509, 518 [170 P.2d 928]; Orgel on *Valuation Under Eminent Domain,* § 30, pp. 98-102.)"

In *Wells Truckways, Ltd.* v. *Cebrian,* 122 Cal.App.2d 666, 677 [265 P.2d 557], this court held:

"The qualification of a witness to testify as an expert is a matter within the sound discretion of the trial court, and where there is no showing of a clear abuse of that discretion, the ruling of that court will not be disturbed on appeal. Where the witness has disclosed a sufficient knowledge of the subject to entitle his opinion to go to the jury the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility. (*People* v. *Haeussler,* 41 Cal.2d 252 [260 P.2d 8]; *Pitt* v. *Southern Pac. Co.,* 121 Cal. App. 228, 236 [9 P.2d 273]; 10 Cal.Jur. 963, § 220.)"

In the instant case the record shows that the provisions of the easement were read to each of the seven witnesses named in appellants' first contention, with additional explanation, and there is no evidence that the witnesses did not understand the terms of the rights shown to be taken. The record also shows that Hummel testified, without objection, that the reasonable value of Section 32, with the development of water, was $200 per acre. He was a real estate broker, familiar with the property and had sold some 3,000 acres to different persons in the area. He knew that substantial water production was established in 1949 and that the land was in a position to be developed for agricultural purposes and that it was especially adapted for the growing of row crops. Adler, who was a farmer and owned 300 acres adjoining Section 32, was likewise familiar with the section

and had made inquiries as to relative values and sales of neighboring properties in 1949 and 1950. He was qualified to express his opinion that the easement would add to the difficulty of farming the remaining portion of Section 32. There was no abuse of discretion shown in the trial court's ruling permitting both him and Hummel to testify as to value and damages under the rules stated in the decisions heretofore cited herein. McGowan did not testify as to market value or severance damages. His testimony was in substance that the cost of installation of an irrigation system would be more with the easement than without it, a fact permissible for the jury to consider in assessing the damages. Icardo and Parks are both farmers and owners of property in the vicinity of Section 32 and were familiar with this section and as such, were entitled to state their opinions as to market value and severance damages under the rules herein announced. Frew and Lombardi, owners of the property involved, each had extensive experience in farming and were competent to express their opinions as to the value of their property. (*Los Angeles City High School Dist.* v. *Rodriguez, supra.*) The witness Gallagher qualified as an expert appraiser and right of way specialist and in fact had been previously employed by the plaintiff Department of Water and Power to acquire rights of way for it. He made an extensive investigation and study of the area involved. The reasons he gave for his opinions as to market value and severance damages are supported by his investigations and information.

Appellants' contention that it was prejudicial error for the court to refuse to limit the number of witnesses is without merit. The trial court may confine the examination of witnesses to reasonable limits and may limit the number of witnesses who may testify concerning a fact. (27 Cal.Jur. 62-63.) It may also limit the number of expert witnesses called by either party. (Code Civ. Proc., § 1871.) We find no prejudicial error in this connection.

It is next contended that it was prejudicial error for the court to deny appellants' right to abandon a portion of the right sought to be acquired by modifying the terms of the easement. On the sixth day of the trial, during the examination of defendants' last witness, the appellants offered an amendment to paragraph five of their complaint, changing the allegation that public interest and necessity required the taking by plaintiffs of the right to construct and maintain roads to read ''to construct and maintain one roadway'' and

plaintiffs also proposed by amendment to provide for certain exceptions and reservations of rights to the owners. Counsel for appellants stated that it had been their endeavor in drafting and preparing the proposed amendment to ''merely clarify the position they had taken from the first witness on through . . . in the last analysis, if it states any reservation of any right to the owners which they do not have as a matter of law under the complaint as filed, it would then in a sense constitute a partial abandonment . . . very minor, not substantial, certainly in our minds.'' The record does not disclose that appellants filed or offered to file a written notice of abandonment or dismissal or abandonment of any of the proceedings. The trial court observed that had the motion been made at the outset the situation would have been entirely different than at the time it was made; that it was then the beginning of the sixth day of the trial; that all the landowners' witnesses had testified with the exception of the last witness whose testimony had not been completed; that if the amendment was permitted, the experts who would follow for the contending agency would, in effect, be testifying to a different easement than had been testified to by the witnesses for the landowners; that because of the point they had reached in the case then, it would confuse the previous testimony by changing the description of the easement. While amendments should be liberally allowed so that all of the issues may be properly presented, the question of whether the filing of an amended pleading should be allowed at the time of trial is ordinarily committed to the sound discretion of the trial court. (*Moss Estate Co.* v. *Adler,* 41 Cal.2d 581, 585 [261 P.2d 732].) In the instant case, under the circumstances, there was no abuse of discretion shown.

Appellants next argue that it was error for the court to limit appellants' expert witnesses on value and damages in their direct testimony and the giving as their reasons comparable sales as a basis for their values. This contention is not supported by the record. The direct examination of plaintiffs' expert witness Carll occupies over 100 pages in the transcript and that of expert Mason some 29 pages. Carll testified as to his preparation for the formation of his opinion and that such preparation included the study of a comparable sales map. The court properly ruled that the witnesses could not testify as to the prices paid in comparable sales. (*People* v. *La Macchia, supra,* 748.) It appears that both Carll and Mason were allowed full scope under direct examination

including the consideration of comparable sales although after one day of direct examination, appellants were not permitted to go into every detail of the many sales.

■ It is next contended that it was error for the court to refuse to give certain instructions requested by appellants. Many of the offered instructions were refused on the ground that they were covered by other instructions and it appears from the instructions actually given that the court clearly, fairly and fully instructed the jury on all the essentials of the case and that no prejudice to plaintiffs resulted from the failure to elaborate in many details as to the law applicable. It is not the rule that merely because an instruction may be said to be applicable to the case from the viewpoint of the party offering it, the court by reason thereof is required to give it. It is sufficient if the court gives instructions which give the jury a well balanced statement of the essential legal principles which are to guide them in their deliberations. (*Chandler* v. *Benafel,* 3 Cal.App.2d 368, 371 [39 P.2d 890].) If the subject matter is properly covered and the law applicable to the case fully and fairly given, that is sufficient, and as is said in *Dodge* v. *San Diego Elec. Ry. Co.,* 92 Cal. App.2d 759, 764 [208 P.2d 37] :

"Instructions should not draw the jury's attention to particular facts. It is error to give and proper to refuse an instruction that unduly overemphasizes issues, theories or defenses either by repetition or by singling them out or making them unduly prominent although the instruction may be a legal proposition. (*Chutuk* v. *Southern Counties Gas Co.,* 21 Cal.2d 372 [132 P.2d 193] ; *McNally* v. *Casner,* 128 Cal. App. 680 [18 P.2d 94] ; *Robertson* v. *Brown,* 37 Cal.App.2d 189 [99 P.2d 288].)"

■ Appellants further argue that the damages are excessive. However, as conceded by them, in order to be excessive the amount must be so disproportionate to reasonable compensation for the monetary loss sustained by plaintiffs as to be explicable only on the ground that passion or prejudice was allowed to play a strong part in the rendition of the verdict and that the only means of discovering the existence of passion or prejudice as influencing the verdict is by comparing the amount of the verdict with the evidence before the court. (*Burke* v. *City & County of San Francisco,* 111 Cal.App.2d 314, 322 [244 P.2d 708].) In the instant case the verdict was substantially lower than the amount of dam-

age testified to by the defendants' witnesses and the record does not disclose that passion or prejudice played a strong part in the verdict of the jury.

Finally, it is argued that the verdict is defective as only seven jurors agreed upon it. The record shows that the verdicts provided for two separate items of damages, as first returned, (1) The value of the easement and right of way in the sum of $4,763.70, and (2) Severance damages of $22,171.96, a total of $26,845.60. When the jury was polled, five of the jurors stated that was not their verdict. The trial court then remarked that perhaps there was a mistake in polling both verdicts at the same time and proceeded to poll the jury on the separate items thereof. The jurors then stated that the verdict for $4,763.70 was the value of the easement and right of way and when polled as to the second verdict, approved it, assessing the severance damages as $22,171.96, nine in favor of this amount and three not in favor of it. It thus appears that the required number of jurors agreed on the sums assessed, both for the easement taken and severance damages and no prejudicial error appears. Furthermore, if there was a defect in the verdict, it was waived by appellants' failure to raise any objection to it until filing their opening brief. As is said in *Brown* v. *Regan*, 10 Cal.2d 519, 523 [75 P.2d 1063]:

"It is well established by numerous authorities that when a verdict is not in proper form and the jury is not required to clarify it, any error in said verdict is waived by the party relying thereon who at the time of its rendition failed to make any request that its informality or uncertainty be corrected." (Citations.)

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied April 12, 1956, and appellants' petition for a hearing by the Supreme Court was denied May 9, 1956.